IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>v.<br><br>UNIVERSITY OF MICHIGAN, and THE REGENTS OF THE UNIVERSITY OF MICHIGAN,<br><br>　　　Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

1.　　"The patient-physician relationship involves a solemn commitment and trust."[1] "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[2]

2.　　For decades, the University of Michigan ("UM") allowed and enabled a physician in its employ, Dr. Robert E. Anderson ("Anderson") to continuously violate that solemn trust. In so doing, UM itself violated the trust of thousands of young male students.

---

[1] University of Michigan President, Mark Schlissel Statement on Sexual Misconduct at February 2020 Board of Regents Meeting (February 20, 2020)

[2] Susan Dorr Goold, MD, MHSA, MA, *Trust, Distrust and Trustworthiness: Lessons from the Field*, 17 J. Gen. Internal Med. 79, 79–81 (2002) (citations omitted).

3.     While employed as a physician by UM from 1968 until 2003, Anderson used his position to repeatedly and regularly sexually assault university students.

4.     Anderson violated these vulnerable student patients by sexually abusing, molesting students in the guise of providing medical care. He used his position to put students in a place of complete vulnerability: naked or partially unclothed in a closed examination room with the expectation that physical contact would occur for medical treatment.

5.     Almost immediately following Anderson's hiring in 1968, UM received complaints from male students about Anderson sexually assaulting them during the course of putative medical examinations.

6.     UM ignored or suppressed these complaints, and in many cases retaliated against those who were brave enough to complain about Anderson's misconduct.

7.     Despite knowing that inappropriate and predatory physical contact would occur, UM continued to give Anderson unfettered access to vulnerable students and the opportunity to abuse them.

8.     Even as numerous supervisors and administrators became aware of Anderson's harmful conduct, UM put its reputation over the safety of its students.

UM never terminated Anderson's employment, even though it was clear he was unfit to treat patients.

9.      In 1979, after receiving repeated complaints that Anderson was sexually assaulting male students during medical examinations on campus, UM did nothing but transfer Anderson from his position as the Director of University Health Services ("UM Health Services") to Senior Physician with UM Health Services.

10.     UM also allowed Anderson to continue with his position as Athletic Physician, where he repeatedly sexually assaulted male student-athletes until he retired in 2003. UM student-athletes were required to see Anderson as part of their athletic training.

11.     UM had and has a duty to protect the health and safety of its students, and this duty includes protecting them from sexual assaults by UM employees, and responding properly if a sexual assault does occur.

12.     UM violated this duty by failing to implement and enforce appropriate policies and procedures to prevent, and properly respond to, sexual assaults of its students; by ignoring and concealing complaints of sexual assaults by Anderson; by retaliating against those who did report misconduct by Anderson; and by failing to properly supervise Anderson and terminate him.

13.    As a result of UM's conduct, Plaintiff and Class members suffered and continue to suffer severe emotional and physical pain, including shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; have suffered and continue to suffer and were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; will sustain loss of earnings and earning capacity, and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## I.    JURISDICTION AND VENUE

14.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States. This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are likely thousands of proposed Class members spread throughout the country; and the aggregate amount in controversy exceeds the jurisdictional amount of $5,000,000.00.

15.    Venue is proper in this District under 28 U.S.C. § 1391(a)–(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the

claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

16.    At all relevant times, Anderson maintained an office at UM in Ann Arbor, Michigan, where he saw Plaintiff and all of his student-patients.

## II.    PARTIES

### A.    Plaintiff

17.    John Doe is a resident of the State of New York and a citizen of the United States.

18.    Plaintiff attended UM as an undergraduate on an academic scholarship from 1989 to 1993.

19.    While at UM, Plaintiff participated on the football team.

20.    Through his participation on the football team, Plaintiff was required to see Anderson approximately six times for physicals and medical ailments.

21.    Plaintiff was sexually assaulted by Anderson at every visit.

22.    At each visit, Anderson ordered Plaintiff to remove his pants or shorts and underwear. Then, with no explanation given—or consent offered—Anderson examined, handled, and fondled Plaintiff's penis and testicles. Anderson next instructed Plaintiff to turn around, after which Anderson digitally penetrated Plaintiff's anus and probed his interior, causing Plaintiff shock, pain, and shame.

23.     Before Anderson, no person had penetrated Plaintiff's anus. As such, it was very confusing and disorientating.

24.     Plaintiff trusted Anderson and UM to protect him. Despite his shock, pain, and trauma, he rationalized Anderson's abuse as part of normal medical protocol. Plaintiff believed that UM's prestigious football team would provide the best possible doctors to care for its players. Plaintiff thus believed Anderson must have had a legitimate medical purpose for his examinations.

25.     Plaintiff had no idea whether other student-patients had similar experiences with Anderson.

26.     During the winter of Plaintiff's junior year, he left the football team briefly in order to avoid another exam by Anderson. That too filled Plaintiff with shame. He rejoined the team four to five weeks later.

27.     UM's football team motto was "Those Who Stay Will be Champions." That said, Plaintiff played through several injuries without reporting them for fear of seeing Anderson.

28.     Throughout Plaintiff's senior year, Plaintiff suffered from "turf burn" (a severe "rug burn" resulting from the removal and burning of layers of skin caused by sliding across artificial grass surface at high speed). Plaintiff's wound, which was on his left elbow and forearm, would not heal as he continued to play and was regularly tackled on it. Every day, after a sweat and dirt filled practice, the

wound bled and oozed until it became infected. Plaintiff discovered the wound was infected when he noticed a few dozen bumps appear near his wound. Team trainers immediately recognized the bumps as a sign of infection and instructed Plaintiff to visit Anderson for antibiotics. Knowing what "a visit" to Anderson entailed, Plaintiff asked if the trainers could simply call Anderson for a prescription. The trainers informed Plaintiff he had to see Anderson in person to obtain the antibiotics. Plaintiff then waited another week, hoping the wound would heal itself and he could avoid seeing Anderson. The infection only got worse.

29.    Eventually, because the team's trainers threatened to pull Plaintiff from practice if he did not address his infection, Plaintiff was forced to see Anderson for antibiotics. As typical, Anderson proceeded to fondle Plaintiff's genitals and digitally penetrate Plaintiff's anus. After Anderson removed his finger from Plaintiff's anus, Anderson offered a pretext for the anal probe for the first time, saying "well, it doesn't seem to have spread."

30.    Before attending UM, Plaintiff played 12 years of youth football, which also required annual physical exams. All of those physicals involved standard hernia exams. None of those exams involved fondling Plaintiff's genitals or probing his anus. Plaintiff also had many prior medical exams for football-related injuries as a kid and was once hospitalized for a bleeding/bruised

kidney. At no time did any doctor treating him for those injuries touch his penis, testicles, or anus.

31.    Plaintiff continues to suffer damages as a result of his abuse by Anderson. He has difficulty trusting people. Doctor visits remain anxiety inducing, often causing him to postpone appointments repeatedly.

32.    His abuse by Anderson continues to cause him numerous emotional and psychological trauma. Plaintiff suffers from generalized anxiety disorder, for which he sees a therapist and psychiatrist.

33.    Plaintiff files this case anonymously because of the extremely sensitive nature of the case as Plaintiff was a victim of sexual assault, and the suit will require disclosure of information "of the utmost intimacy"; Plaintiff is therefore entitled to protect his identity in this public filing by not disclosing his name. *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004) (citing *Doe v. Stegall*, 653 F.2d 180, 185–86 (5th Cir. 1981)).

34.    Plaintiff deeply loves UM and its football team and is proud to have been an honor student and someone who wore the winged helmet.

**B.    Defendants**

35.    Defendant UM was at all relevant times and continues to be a public university organized and existing under the laws of the State of Michigan.

36.    At all relevant times, including the years 1968 to 2003, Anderson was acting within the course and scope of his employment or agency with UM.

37.    The Regents of the University of Michigan ("Board of Regents") is a body corporate, with the right to be sued, vested with the government of the university. M.C.L. § 390.3 and 390.4.

38.    The Board of Regents is the governing body of UM.

39.    The Board of Regents is responsible for setting and approving all public policy at UM, including sex discrimination policy.

40.    Defendants UM and Board of Regents are collectively referred to herein as the "Defendants."

41.    Defendants receive, and at all relevant times received, federal financial assistance and are therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq.

## III.    FACTUAL ALLEGATIONS

### A.    Anderson's History of Employment and Sexual Predation at UM.

42.    From 1968 until 2003, Anderson was employed by UM as a physician.

43.    Throughout his employment at UM, Anderson treated students on UM's Ann Arbor campus.

44. During his tenure at UM, Anderson held numerous titles, including Director of Health Services, Senior Physician with Health Services, and Athletic Senior Physician.

45. In his roles with UM Health Service, Anderson regularly saw male students as patients for general health-related inquiries, medical ailments, physical examinations, prescription drug consultations, and military draft consultations.

46. In his role as Athletic Physician, Anderson treated members of the wrestling, football, and hockey teams for nearly every medical ailment, complaint, and injury as their UM-assigned internist. He served as one of their first medical points of contact no matter the injury or ailment at issue, including everything from a cold to broken bones. Indeed, student-athletes were required to see Anderson even when they were not injured; regular physicals and checkups with Anderson were required for all student-athletes.

47. In all of these roles, and throughout the entirety of his employment with UM, Anderson regularly and repeatedly sexually assaulted, abused, and molested male students by engaging in nonconsensual sexual touching, assault, and harassment, including but not limited to medically unnecessary genital manipulation and digital anal penetration.

**B.**     **UM Students (And Their Parents) Entrusted Their Medical Care to UM.**

48.     Experts believe health is an important factor for academic achievement in higher education.[3] "Health complaints limit students' capacity to perform adequately at university."[4] Thus, a university's promotion of health and well-being of its students promotes effective learning.[5]

49.     Trust is essential to both physician and patient.[6] "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[7]

50.     "Presumed consent is a critical manifestation of trust that makes possible much of routine doctor visits."[8] Absent a presumption of trust, patients might avoid essential medical care.[9]

51.     "Important as it is to measure trust in individual clinicians and the actions and circumstances that affect it, it is equally important, in today's health

---

[3] Walid El Ansari & Christiane Stock, *Is the Health and Wellbeing of University Students Associated with their Academic Performance?* 7 INT'L J. ENVTL. RES. PUB. HEALTH 509, 509–527 (2010) (citations omitted).

[4] *Id.*

[5] *Id.*

[6] Dorr Goold, *supra* note 1.

[7] *Id.*

[8] *Id.*, citing Ruth Faden & Tom Beauchamp, A HISTORY AND THEORY OF INFORMED CONSENT 274–80 (Oxford Univ. Press 1986).

[9] *Id.*

system, to study (empirically and normatively) trust and trustworthiness in organizations and institutions."[10]

52.     Knowing young male students would place their trust in its physicians, Defendants had a duty to ensure that Anderson used his trusted position and the safe confines of a doctor's exam room in UM's Athletic Department and UM Health Services consistent with the standard of care and certainly not to abuse that trust through the molestation of students.

**C.      UM Betrayed Students' Trust and Demonstrated a Pattern of Indifference to Sexual Harassment and Abuse.**

53.     Throughout Anderson's tenure at UM, beginning in 1968, UM repeatedly received complaints about Anderson's sexual misconduct and predation. But UM just concealed Anderson's misconduct and continued to allow Anderson access and opportunity to abuse UM students until he voluntarily retired in 2003. In so doing, UM put its own reputation above the safety of its students.

54.      Moreover, UM's lack of and/or failure to enforce adequate policies and procedures for the proper response to on-campus sexual assaults of its students exacerbates and amplifies the trauma of the actual assault due to institutional betrayal.

55.     The term "Institutional Betrayal" refers to wrongdoings perpetrated by an institution upon individuals dependent on that institution, including failure to

---

[10] *Id.*

prevent or respond supportively to wrongdoings by individuals (e.g. sexual assault) committed within the context of the institution.[11]

56.    Indeed, UM's culture of indifference to the safety and well-being of its students has caused sexual violence to flourish at UM for decades. This toxic culture continues to thrive to this day.

### 2.    UM learned as early as 1968 of Anderson's sexual predation of students.

57.    In 1968, a then-UM student, Gary Bailey went for an examination by Anderson, which he later described to the Detroit News as "very traumatic."[12]

58.    Bailey states "he (Anderson) had me drop my pants, he felt my penis and genitals, and subsequently, he (Anderson) wanted me to feel his (Anderson's) penis and genitals." Bailey further states, "Back then you did not question a doctor's authority . . . He asked me to pull on his penis."[13]

59.    Bailey filed a written complaint with the UM Health Service and filled out a form, complaining that Anderson had dropped his pants and asked him to fondle his genitals during the exam.

---

[11] Jennifer J. Freyd, *Institutional Betrayal and Institutional Courage*, https://dynamic.uoregon.edu/jjf/institutionalbetrayal/. *See also* Carly Parnitzke Smith & Jennifer J. Freyd, *Institutional Betrayal*, 69 AM. PSYCH. ASSOC. 575 (2014).

[12] Kim Kozlowski, *Alum Says He Told UM Of Doctor's Sex Abuse In '68 But Never Got A Response*, THE DETROIT NEWS (last visited March 3, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/02/20/alum-says-he-told-university-michigan-about-doctor-sex-abuse/4817480002/, Exhibit A.

[13] *Id.*

60.     No one from UM Health Services or any other UM department followed up with Bailey or contacted him as part of an investigation into Bailey's written sexual assault complaint.

61.     On information and belief, UM never acted on and/or investigated Bailey's complaint against Anderson.

### 3.     UM was warned again in 1975 about Anderson's sexual predation.

62.     In 1975, UM student and scholarship member of UM's wrestling team, Tad Deluca, gave notice of Anderson's sexual misconduct in a 9-page letter to UM's head wrestling coach, Bill Johannesen, complaining that "Something [was] wrong with [Anderson]" and "[r]egardless of what you are there for, Dr. Anderson makes you drop your drawers."[14]

63.     Neither UM, Coach Johannesen, nor any agents of UM investigated Mr. Deluca's complaints about Anderson's sexual assaults; instead Defendants retaliated against Deluca by stripping him of his athletic scholarship and kicked him off the wrestling team.

---

[14] David Jesse, *Former U-M Wrestler: I blew whistle on U-M doctor in 1975, was dismissed from team*, DETROIT FREE PRESS (last visited March 3, 2020), https://www.freep.com/story/news/education/2020/02/27/robert-anderson-university-of-michigan-tad-deluca-sex-abuse-scandal/4890575002/, Exhibit B.

64.     Deluca appealed to then Athletic Director, Don Canham, and provided him with a copy of the letter sent to Coach Johannesen, giving Director Canham notice of the allegations against Anderson.

65.     Director Canham did not investigate the sexual abuse complaints against Anderson, and instead, upheld the revocation of Mr. Deluca's athletic scholarship.

66.     Mr. Deluca had to hire an attorney and appeal to UM's Board of Intercollegiate Athletics to have his scholarship reinstated.

67.     Johannesen admits to hearing jokes about Anderson's proclivity to "examine" the genitals of male student-athletes. According to Johannesen, "[t]he joke was that you go to see [Anderson], and you have a sore elbow, he would say, 'OK, pull your pants down.'"[15]

68.     Indeed, because so many student-patients were victims of Anderson, he was referred to by them as "Dr. Drop Your Drawers."[16]

---

[15] Kim Kozlowski, *Ex-Wrestler Says UM Ignored His Abuse Claims, Kicked Him Off Team*, THE DETROIT NEWS (last visited March 3, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/02/27/former-university-michigan-athletes-abuse-allegations-robert-anderson/4869148002/, Exhibit C.

[16] Kim Kozlowski, *UM Official 'Fired' Doctor Accused Of Sex Abuse, But He Stayed On Another 24 Years*, THE DETROIT NEWS (last visited March 3, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/02/21/michigan-doctor-fired-sex-abuse-served-football-team-doctor-24-more-years/4835017002/., Exhibit D.

69.    That same year, 1975, a then-graduate student was sexually abused by Anderson and complained to UM staff. The student saw Anderson at UM Health Services and during the course of his visit, Anderson inserted his fingers into the student's rectum without medical purpose. The student complained loudly to the desk clerk and an administrator, both of whom dismissed him and ordered a security guard to escort him out of UM Health Services. UM failed to investigate the student's allegation against Anderson.

### 4.    UM concealed Anderson's sexual predation upon receiving credible allegations in 1979.

70.    In 1979, then-UM Vice President of Student Life, Tom Easthope learned of credible allegations that Anderson had assaulted several members of the gay community at UM and was "fooling around with male students" in the exam room.[17]

71.    According to Eastrope, upon hearing the allegations he "walk[ed] across the campus to Health Services to fire [Anderson]." When he confronted Anderson about the allegations, Anderson did not deny them.[18]

72.    Easthope initially told detectives that he fired Anderson "on the spot."[19]  Shortly thereafter, however, Easthope said he may have allowed Anderson

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

to resign. He told the officers he believed Anderson had returned to private practice.[20]

73.    In reality, Anderson was never fired and did not leave UM until retirement in 2003.

74.    According to UM human resource records, instead of terminating Anderson from the UM, UM transferred him from Director of Health Services to a position as Senior Physician with Health Services, effective January 14, 1980. The reason for his transfer as stated in Anderson's personnel file was "resuming former position."[21]

75.    Despite UM's knowledge of Anderson's misconduct, Anderson continued to work as a physician with UM and as a physician in UM's Athletic Department. Indeed, according to longtime UM athletic trainer Russell Miller, after Anderson's transfer from UM Health Services Director, Athletic Director Canham, a legendary and powerful figure at the UM, "worked out a deal" to increase Anderson's role in the Athletic Department.[22]

76.    Despite UM's knowledge of Anderson's misconduct, it continued to hold him out as a leader in its healthcare community. UM went so far as to

---

[20] *Id.*

[21] Affidavit for Search Warrant by Detective Ryan A. Cavanaugh, dated November 15, 2018, Exhibit E.

[22] Officer Narrative Dated November 9, 2018, UM Division of Public Safety & Security, Exhibit F.

fraudulently conceal Anderson's predatory sexual misconduct, intentionally concealing the reason for Anderson's departure as Director of UM Health Services.

77.    In this regard, UM praised Anderson in its publication, Volume III of the President's Report of The University of Michigan for 1979–1980.[23]

78.    The UM publication states in its "Acknowledgement" preface: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine . . . his many contributions to health care are acknowledged. . . . The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him." It further confirms that after his transfer, Anderson "continue[d] as a senior physician on the medical staff" at UM.[24]

79.    Thereafter, Anderson had free rein to abuse thousands of male students with impunity, including Plaintiff and Class members.

80.    Even upon learning of more allegations, UM continued to protect Anderson and its own reputation instead of the safety of its students.

---

[23] Excerpts from *President's Report of The University of Michigan*, Vol. III, (1979–1980), Exhibit G.
[24] *Id.*

81.    In 1994, the predecessor of Michigan's Department of Licensing and Regulatory Affairs ("LARA") received a complaint about a1973 incident, where Anderson fondled the genitals of an undergraduate man to the point of ejaculation. In the ordinary course of a reported sexual assault by a regulated professional, LARA would have contacted UM as Anderson's employer.

**D.     Unlike UM, Anderson's Victims Did Not and Could Not Reasonably Know Until February 2020 That UM Put Them at Risk of Sexual Assault—and Allowed Them to Be Sexually Assaulted—by Anderson.**

82.    Although Anderson's victims were confused, uncomfortable, and traumatized following their encounters with Anderson, they did not understand the nature of Anderson's abuse, or rather that his actions were not part of necessary medical treatment but rather sexual assault to satisfy Anderson's sexual desires.

83.    Despite being uncomfortable with Anderson's "examinations" and "treatments," student-patients were led to believe by those with positions of authority, including Athletic Director Canham, coaches and trainers, and Anderson himself, that everything Anderson did was medically necessary or helpful.

84.    Anderson thus took advantage of the inherent power imbalance between a physician and young patient by making completely inappropriate behavior seem medically legitimate.

85.   Anderson's victims did not know, and could not reasonably understand that they were being sexually assaulted at the time Anderson abused them.

86.   As a result of this power imbalance, culture of retaliation, and disguising of abuse as legitimate medical procedures many of Anderson's victims stayed silent about their abuse for years.

87.   On or about July 18, 2018, UM alumnus and victim of Anderson, Tad Deluca, sent a letter to the current UM Athletic Director, once again notifying UM—as he did in 1975—of Anderson's sexual misconduct.

88.   It was not until UM received Deluca's letter in 2018—50 years after hiring Anderson, 50 years after UM received first complaint about Anderson's misconduct, 43 years after Deluca's initial complaint, 15 years after Anderson's retirement, and 10 years after Anderson's death—that UM requested police open an investigation into Anderson's misconduct.

89.   Still, UM did not take further action to notify former students and/or the public about the allegations  and/or investigation until almost two years later.

90.   On February 19, 2020, UM, for the first time, publicly announced it had launched investigations into Anderson's sexual misconduct, admitting five former students had made abuse allegations.

91.    The next day, February 20, 2020, UM made its first public acknowledgement of Anderson's abuse and its knowledge thereof. In a prepared statement, UM President Mark Schlissel admitted, "[UM] police found indications that U-M staff members were aware of rumors and allegations of misconduct during  Anderson's medical exams."[25]

### E.    Anderson's Victims Have Suffered and Will Continue to Suffer Damages from UM's Institutional Betrayal.

92.    Symptoms of male sexual abuse on male adults can last for decades and affect their lives in many ways from causing sexual dysfunction and the inability to engage in close relationships with others to confusion about sexual identity, embarrassment, and depression.[26]

93.    Psychological damage from sexual abuse is especially harmful when the perpetrator is known and trusted by the victim.[27]

94.    When sexual abuse is perpetrated by a medical provider, patients often lack the ability to comprehend the abuse due to the provider's position of

---

[25] University of Michigan President, Mark Schlissel Statement on Sexual Misconduct at February 2020 Board of Regents Meeting (February 20, 2020).

[26] See *Male Victims of Male Sexual Assault: A Review of Psychological Consequences and Treatment* (Sexual and Relationship Therapy, August 2001); *Effects of Sexual Assaults on Men: Physical, Mental and Sexual Consequences* (International Journal of Men's Health, Vol. 6, No. 1, Spring 2007, pp. 22–35)

[27] See *Integration of Sexual Trauma in a Religious Narrative:  Transformation, Resolution and Growth among Contemplative Nuns* (Transcult Psychiatry, Feb. 2013; 50 (1): 21–46); *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond* (EVAW's OnLine Training Institute, May 2019, p. 34).

access, trust and authority and commonly suffer from emotional distress, humiliation, and the inability to trust medical care providers or the medical care professional generally.[28]

95.    Plaintiff and Class members to this day suffer continuing trauma as a result of the Defendants' Institutional Betrayal and failure to implement proper protective measures. Without implementing the proper policies and procedures to protect students from serial sexual predators, Plaintiff and Class members will continue to suffer damages as a result of Defendants' Institutional Betrayal.

## IV.    FRAUDULENT CONCEALMENT TOLLING

96.    Under M.C.L. § 600.5855, statutes of limitations are tolled when "a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim[.]"

97.    Both Anderson and the Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, and directors, fraudulently concealed the existence of Plaintiff and Class members' claims by (1) concealing from Plaintiff and Class members that the Defendants and their employees, agents, and representatives were aware of Anderson's sexual

---

[28] *See Above All, Do No Harm: Abuse of Power by Health Care Professionals*, by Kathleen S. Lundgren, Wanda S. Needleman, Janet W. Wohlberg (2004), available at https://www.therapyabuse.org/p2-abuse-of-power.htm

abuse and did nothing to stop it; (2) affirmatively telling Plaintiff and the class that Anderson's procedures were normal and/or medically necessary, (3) publishing a statement that Anderson was a renowned physician to be trusted and respected in a publication delivered to and read by university students, (4) concealing from Plaintiff and Class members that UM was aware of Anderson's abuse since at least 1968, thereby concealing UM's identity from Plaintiff and Class members as a "person who is liable for the claim," as set forth in more detail below.

98.  Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, athletic directors, other athletic department representatives, and members of UM's administration, made affirmative representations to Plaintiff and Class members, referred to collectively as "Defendants' representations," that:

   a.  Anderson was to be trusted and not questioned, and his devotion to medical care at UM was worthy of public recognition and celebration, stating: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him," published in the Acknowledgement preface of Volume III of the President's Report of The University Of Michigan for 1979–1980;

   b.  Anderson was to be trusted and not questioned as his services were worthy of recognition by UM dedicating "the Annual

Report to him" even though UM and its executives knew that Easthope had intended to fire Anderson for his inappropriate sexual conduct toward male students;

c.  Anderson's genital groping and anal penetrations were normal, medically necessary, proper, appropriate, legitimate, and/or medically beneficial, generally;

d.  Anderson's genital groping and anal penetrations were normal, medically necessary, proper, appropriate, legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 23, with no reported issues related to genitals and/or anus;

e.  UM student-athletes required to be subjected to Anderson's treatments as they were normal, medically necessary, proper, appropriate, legitimate, and/or medically beneficial;

f.  Anderson would treat their ailments and injuries in an ethical and competent manner, and therefore non-criminal manner;

g.  Anderson was not sexually assaulting Plaintiff and Class members;

h.  Plaintiff and Class members should not question and/or report the conduct to appropriate authorities; and

i.  there was no possible cause of action against Anderson and/or UM.

99.  Defendants' representations were false. Defendants were aware that genital manipulation and/or digital anal penetrations are almost never needed for any physical or medical treatment of healthy college-aged males.

100.  Defendants knew the representations were false. Defendants received several complaints about Anderson's sexual assaults prior to Plaintiff and Class members arriving on campus.

101.   Defendants made the material representations, knowing they were false and/or made the material representations recklessly, without any knowledge of their truth and as a positive assertion, in that they had previously received strikingly similar complaints of abuse by Anderson from other students and student athletes and knew that the appropriateness of his genital and anal examinations had been questioned in the past.

102.   Defendants' representations were material, in that had Plaintiff and Class members known the representations were false, they would have stopped seeking treatment from Anderson immediately.

103.   Defendants' representations were made with the intent that Plaintiff and Class members would rely on them as UM sought to prevent Plaintiff and Class members from discovering their causes of action against Anderson and/or UM.

104.   Plaintiff and Class members did, in fact, rely on Defendants' representations; indeed, the representations led Plaintiff and Class members to continue seeking treatment from Anderson, and had they known the representations were false, Plaintiff and Class members would have stopped treating with Anderson.

105.    Defendants concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of fraud, in that they:

    a.    Refused to terminate Anderson and thus validated him through continued employment as a physician with one of the world's great institutions of higher learning;

    b.    Affirmatively lied in written publications about Anderson "resigning" from UM Health Services when he was fired, and then retained but demoted him, for assaults on male students;

    c.    Ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Anderson's genital and anal examinations; and

    d.    Retaliated against those who did report Anderson's misconduct.

106.    Defendants knew, and Plaintiff and Class members were in fact, particularly susceptible to believing Defendants' representations because:

    a.    Plaintiff and Class members were young and inexperienced;

    b.    Defendants' representations were made within the context of a pervasive culture created by statements made by representatives of UM, including coaches, trainers, directors, and other leaders of the Athletic Department, that Anderson's treatments were necessary and Anderson was a competent and ethical physician, to be trusted and never questioned;

    c.    Plaintiff and Class members largely had no prior experience with legitimate and appropriately performed medical treatments that involve anal penetration and/or genital manipulation, so it was impossible for his victims to differentiate a legitimate and appropriately performed anal penetration and/or genital manipulation from sexual assault;

    d.    Plaintiff and Class members could not have possibly known because there were no parents, coaches, guardians, caregivers,

and/or other medical professionals in the room during the sexual assaults to observe, question, and/or discover the assaults;

e. Plaintiff and Class members were intimidated by Anderson's notoriety and reputation and therefore believed his representations;

f. Plaintiff and Class members trusted Anderson due to his position of trust and authority, and reputation;

g. Plaintiff and other UM student-athletes were pressured to submit to Anderson's sexual assaults without question in order to keep their scholarship, stay on their teams, and remain at UM to earn college degree;

h. Plaintiff and Class members victims were could not have been aware of other allegations of abuse because Anderson and UM concealed any such allegations and fostered a culture that normalized Anderson's treatments; and

i. There were no public accounts of Anderson's sexual misconduct;

107. Accordingly, Plaintiff and Class members did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Defendants until media reports of Anderson's serial sexual assaults beginning on February 19, 2020.

108. Because UM had a fiduciary duty to Plaintiff and Class members, the failure to disclose material information is also fraudulent.

109. At all times pertinent to this action, the sports medicine trainers, trainers, employees, staff, managers, supervisors, coaches, and directors of Defendants were agents, apparent agents, servants, and employees of Defendants

and operated within the scope of their employment and their fraudulent concealment is imputed to Defendants.

110.   In addition to affirmative false representations, UM coaches, officials, agents, and representatives failed to disclose to Plaintiff and Class members that they were being sexually abused and that Anderson had a history of committing sexual assaults in the guise of medical treatment.

111.   Defendants' representations caused Plaintiff and Class members to be exposed to the risk of sexual assault by Anderson, and to actually be sexually assaulted by Anderson.

112.   Defendants are equitably estopped from relying upon a statute of limitations defense because of their gross negligence and silence as well as their active and deliberate efforts to deceive Plaintiff and the Class Members and to conceal their unlawful and grossly negligent conduct.   Through their gross negligence and silence, Defendants encouraged and influenced Plaintiff and Class Members to act to their disadvantage by telling them that their complaints about Anderson were unfounded, encouraging them to continue seeing Anderson professionally and making them feel ashamed, such that Plaintiff and Class Members could not discover the nature, scope, and magnitude of Defendants' misconduct.   As set forth herein, Defendants also took active steps to misrepresent material facts.

113. Plaintiff and Class Members' claims should be equitably tolled because any alleged failure to meet any deadline unavoidable arose from circumstances beyond Plaintiff and Class Members' control:   (a) Defendants concealed material facts regarding Anderson's misconduct and for decades, Defendants misrepresented and fraudulently concealed this activity and the substantial risks posed by that misconduct;   Defendants intended for the public, including this Plaintiff and Class Members to be deceived by this fraud such that Anderson's conduct remained unstopped for decades and the repercussions of his misconduct were not dealt with to the detriment of Plaintiff and Class Members; As set forth herein, Defendants knew the actual facts, to wit that Anderson used his position as a physician to sexually assault the students under his care and that the Defendants knowingly did nothing to stop it.

## V.   **CLASS ALLEGATIONS**

114. Plaintiff brings this action pursuant to Rules 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and the following Class:

> All male students who were seen by Anderson at UM
> between 1968 and 2003.

115. The Class consists of thousands of men, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the

Class and the identities of the individual members are ascertainable through records maintained by UM.

116.  Plaintiff's claims are typical of the Class. Plaintiff and Class members' claims and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of UM's failure to implement and enforce appropriate policies and procedures to prevent and properly respond to sexual harassment and assault; and UM's culture of covering up for and protecting Anderson instead of protecting its students.

117.  There are many questions of law and fact common to Plaintiff's claims and the Class, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

118.  Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

     a.    Whether Anderson engaged in sexual harassment, assault, and battery;

     b.    Whether Anderson's sexual harassment, assault, and battery was committed within the scope of his employment at UM;

     c.    Whether Defendants had knowledge of Anderson's sexual harassment, assault, and battery;

     d.    Whether Defendants facilitated Anderson's pattern and practice of sexual harassment, assault, and battery;

e.   Whether Defendants or Anderson engaged in conduct designed to ignore or suppress complaints or reports regarding Anderson's conduct;

f.   Whether UM negligently retained or supervised Anderson;

g.   Whether Defendants ratified Anderson's conduct; and

h.   Whether UM is responsible for Anderson's conduct under the doctrine of *respondeat superior*.

119.   A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The highly sensitive and private nature of the facts involved here counsels toward providing a class vehicle to adjudicate these claims. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate these claims. As a result, it would be impracticable for Class members to seek redress individually. Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

120.   Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including sex abuse class actions

such as *In Re USC Student Health Center Litigation*, W.D. Cal, Case No. 2:18-cv-04258-SVW. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other respective Class members, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interests adverse to those of the other members of the Class.

## VI.   CLAIMS FOR RELIEF

### COUNT I
### Violation of Title IX, 20 U.S.C. § 1681, *et seq.*
### Creation of Sexually Hostile Culture/Heightened Risk of Sexual Harassment
### (Against All Defendants)

121.   Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

122.   Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

123.   Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

- 32 -

124.   Defendants receive, and at all relevant times received, federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq.

125.   As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

126.   Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

127.   Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault—by school employees, students, and third parties.

128.   Title IX requires Defendants to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

129.   Defendant Board of Regents is responsible for setting and approving all public policy at UM, including sex discrimination policy.

130.   Anderson was an UM employee whose actions were carried out as athletic team doctor, and physician at UM.

131.   Anderson's sexual harassment of Plaintiff and Class members—which included, among other things, fondling their testicles, fondling their penises,

digitally penetrating their rectums, rubbing his erect penis on their bodies, and making inappropriate sexualized comments—was sex discrimination under Title IX.

132.   Anderson's sexual harassment of Plaintiff and Class members was rampant, occurring regularly on campus, for more than three decades.

133.   Defendants had actual knowledge of Anderson's serial sexual harassment and permitted it to continue unchecked throughout Anderson's employment.

134.   Throughout Anderson's 35-year tenure at UM, beginning in 1968, students, student-athletes, and coaches conveyed complaints and concerns to UM administrators and employees about Anderson's inappropriate conduct.

135.   Specifically, Defendants were notified about Anderson's sexual harassment through UM employees with authority to take corrective action to address it.

136.   Tad Deluca publicly stated in 2020 that he reported Anderson's sexual misconduct to higher authorities at UM in 1975, but they did nothing.

137.   UM was required under Title IX to promptly investigate and address allegations, reports and/or complaints of unwelcome, inappropriate touching, and comments by Anderson, but UM did not do so.

138.   UM created and was deliberately indifferent to a sexually hostile culture within its athletic and student health programs, by, among other things:

  a.   Mishandling students' reports about Anderson's conduct and/or discouraging students from reporting Anderson's conduct;

  b.   Failing to promptly and appropriately investigate, remedy, and respond to complaints about Anderson's conduct;

  c.   Increasing Anderson's access to UM student-athletes, despite students' complaints about Anderson's conduct;

  d.   Failing to adequately supervise Anderson, after learning that he posed a substantial risk to the safety of all male students;

  e.   Failing to take corrective action to prevent Anderson from sexually harassing other students;

  f.   Requiring student-athletes to see Anderson for annual physicals and medical treatment in order to participate in university sports and maintain their athletic scholarships—even after student-athletes complained to administrators and employees about the ways Anderson's inappropriate conduct during medical examinations; and

  g.   Joking about Anderson's conduct with students.

139.   UM's creation of and deliberate indifference to the sexually hostile culture within its athletic and student health programs substantially increased the risk that Plaintiff and Class members would be sexually harassed.

140.   The Board of Regents failure to set appropriate sex discrimination policy, in light of UM's deliberate indifference to the sexually hostile culture within its athletic and student health programs substantially increased the risk that Plaintiff and Class members would be sexually harassed.

141.   The sexual harassment that Plaintiff and Class members suffered was so severe, pervasive, and objectively offensive that it effectively barred their access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

142.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiff and Class members were damaged and continue to suffer damages.

143.   In subjecting Plaintiff and Class members to the wrongful treatment herein described, and through its violations of Title IX, Defendants, in their effort to "save face" and avoid bad publicity, acted willfully and maliciously with the intent to harm Plaintiff and Class members, and in conscious disregard of Plaintiff and Class members' rights, so as to constitute malice and oppression. Plaintiff and Class members are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants, in a sum to be shown according to proof.

144.   Furthermore, Plaintiff requests the award of attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## COUNT II
### Violation of Title IX, 20 U.S.C. § 1681(a), *et seq*.
### Deliberate Indifference to Prior Sexual Harassment
### (Against All Defendants)

145.   Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

146.   Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

147.   Title IX, 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

148.   Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

149.  Defendants receive, and at all relevant times received, federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq.

150.   As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

151.   Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

152.   Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment-including sexual assault-by school employees, students, and third parties.

153.   Title IX requires UM to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

154.   Before Anderson sexually harassed Plaintiff and Class members, UM had actual knowledge of Anderson's prior sexual harassment of male students at UM, beginning in 1968.

155.   Based on Anderson's prior conduct, UM had actual knowledge of the substantial risk that Anderson would sexually harass other male students at UM.

156.   UM officials, with the knowledge described above, had the authority to address the risk posed by Anderson, and had the authority to take corrective measures by, among other things, closely supervising Anderson, not allowing him

to examine to examine students without another medical professional present, or terminating his employment.

157.    UM's failure to address the substantial risk posed by Anderson, given prior complaints and reports about his inappropriate conduct, was clearly unreasonable in light of the known circumstances.

158.    The Board of Regents failure to set appropriate sex discrimination policy, in light of UM's failure to address the substantial risk posed by a serial predator, was clearly unreasonable in light of the known circumstances.

159.    By their acts and omissions, Defendants were deliberately indifferent to the substantial risk that Anderson would sexually harass male students at UM.

160.    As a result of Defendants' deliberate indifference, Plaintiff and Class members were subjected to severe sexual harassment by Anderson, including sexual assault in the guise of medical care.

161.    The sexual harassment that Plaintiff and Class members suffered was so severe, pervasive, and objectively offensive that it deprived Plaintiff and Class members of access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

162.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiff and Class members were damaged and continue to suffer damages.

163.    In subjecting Plaintiff and Class members to the wrongful treatment herein described, and through its violations of Title IX, UM, Defendants in their effort to "save face" and avoid bad publicity, acted willfully and maliciously with the intent to harm Plaintiff and Class members, and in conscious disregard of Plaintiff and Class members' rights, so as to constitute malice and oppression. Plaintiff and Class members are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants, in a sum to be shown according to proof.

164.    Furthermore, Plaintiff requests the award of attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## COUNT III
### Injunctive And Equitable Relief
### (Against All Defendants)

165.    All allegations and paragraphs in this complaint are incorporated by reference.

166.    An actual, justiciable controversy exists between Plaintiff and Class members and Defendants. A judgment from this Court regarding these issues would afford relief from uncertainty and insecurity with respects to rights, status, and other legal relations of the parties.

167.    Defendants are required under Federal law to protect and aid its students. This includes a duty:

    a.     to protect students from sexual assaults on their campus;

    b.     to set proper policies and guidelines to protect students from sexual assault on their campus;

    c.     to report on-campus sexual assault to the proper authorities;

    d.     to respond properly to sexual assaults that do occur; and

    e.     to supervise and stop their employees from committing wrongful sexual acts with student patients.

168. Defendants have breached their duty to Plaintiff and Class members by failing:

    a.     to set, implement and enforce appropriate policies and procedures to prevent, or properly respond to on-campus sexual assaults;

    b.     to report on-campus sexual assaults to the proper authorities, or to any authorities; and

    c.     to supervise and stop their employees from committing wrongful sexual acts with student patients, including Plaintiff and Class members

169. Plaintiff and Class members have an adverse legal interest to Defendants. This adverse interest and the controversy that exists between the parties can be resolved through the specific relief sought.

170. Plaintiff and Class members to this day suffer continuing trauma as a result of the Defendants' Institutional Betrayal and failure to implement proper protective measures. Without implementing the proper policies and procedures to protect students from serial sexual predators, Plaintiff and Class members will continue to suffer damages as a result of Defendants' Institutional Betrayal.

171.   Wherefore, Plaintiff, on behalf of himself and the Class, requests that the Court issue an Order:

     a.    requiring Defendants to establish and implement a uniform policy, including training and education for its employees and staff, for how to identify sexual assault;

     b.    requiring Defendants to establish and implement a policies and procedures for the prevention and deterrence of sexual assault, including student education and messaging, clear communication of consequences;

     c.    requiring Defendants to establish and implement a uniform policy, including training and education for its employees, professors, and staff, for how to respond to student sexual assault that includes humane and trauma-informed treatment of the alleged victim(s);

     d.    requiring Defendants to track all reports of sexual assault;

     e.    requiring Defendants to establish a uniform policy, including training and education for its staff, for how to report sexual assault to the proper authorities, and making reporting of student sexual assault to authorities mandatory;

     f.    requiring Defendants to implement pre-hiring background checks of all new personnel, including physicians, who are regularly expected to have direct patient interaction;

     g.    requiring Defendants to implement annual verification of credentials of all clinical personnel, including physicians;

     h.    requiring Defendants provide all students accessing UM Health Services with a consent form informing them of the UM's commitment and steps taken to prevent any recurrence, along with a brochure outlining what to expect during a visit; and

     i.    create a procedure for anonymous patient feedback concerning UM Health Services and its personnel.

## VII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all Class members, pray that this Court:

A.     Certify the Class, name Plaintiff as representative of the Class, and appoint his lawyers as Class Counsel;

B.     Enter judgment against University of Michigan in favor of Plaintiff and Class members;

C.     Enter judgment against The Regents of the University of Michigan in favor of Plaintiff and Class members;

D.     Enter appropriate equitable relief as explained in Count XI and as the Court deems just, proper, and fair;

E.     Award Plaintiff and Class members damages for pain and suffering, and compensatory and punitive damages; and

F.     Award Plaintiff his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

Dated:  March 9, 2020                    Respectfully submitted,

                                         */s/ E. Powell Miller*
                                         E. Powell Miller (P39487)
                                         Sharon S. Almonrode (P33938)
                                         THE MILLER LAW FIRM, P.C.
                                         950 W. University Dr., Suite 30
                                         Rochester, MI 48307
                                         (248) 843-0997
                                         (248) 652-2852

- 43 -

Email: epm@millerlaw.com
Email: ssa@millerlawpc.com

Jonathan D. Selbin
Annika K. Martin
Patrick I. Andrews
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th fl.
New York, NY 10013
(212) 355-9500
Email: akmartin@lchb.com
Email: jselbin@lchb.com
Email: pandrews@lchb.com

Joseph Sauder
SAUDER SCHELKOPF LLC
1109 Lancaster Avenue
Berwyn, PA 19312
(888) 711-9975
Email: jgs@sstriallawyers.com