IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JOHN DOE and RICHARD ROE, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF MICHIGAN, and THE REGENTS OF THE UNIVERSITY OF MICHIGAN,<br><br>      Defendants. | Case No.: 2:20-cv-10629-VAR-EAS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

1.     "The patient-physician relationship involves a solemn commitment and trust."[1] "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[2]

2.     For decades, the University of Michigan ("U of M") allowed and enabled a physician in its employ, Dr. Robert E. Anderson ("Anderson") to continuously violate that solemn trust. In so doing, U of M itself violated the trust of thousands of young male students.

---

[1] University of Michigan President, Mark Schlissel Statement on Sexual Misconduct at February 2020 Board of Regents Meeting (February 20, 2020)

[2] Susan Dorr Goold, MD, MHSA, MA, *Trust, Distrust and Trustworthiness: Lessons from the Field*, 17 J. GEN. INTERNAL MED. 79, 79–81 (2002) (citations omitted).

3.     While employed as a physician by U of M from 1968 until 2003, Anderson used his position to repeatedly and regularly sexually assault university students.

4.     Anderson violated these vulnerable student patients by sexually abusing, molesting students in the guise of providing medical care. He used his position to put students in a place of complete vulnerability: naked or partially unclothed in a closed examination room with the expectation that physical contact would occur for medical treatment.

5.     Almost immediately following Anderson's hiring in 1968, U of M received complaints from male students about Anderson sexually assaulting them during the course of putative medical examinations.

6.     U of M ignored or suppressed these complaints, and in many cases retaliated against those who were brave enough to complain about Anderson's misconduct.

7.     Despite knowing that inappropriate and predatory physical contact would occur, U of M continued to give Anderson unfettered access to vulnerable students and the opportunity to abuse them.

8.     Even as numerous supervisors and administrators became aware of Anderson's harmful conduct, U of M put its reputation over the safety of its

students. U of M never terminated Anderson's employment, even though it was clear he was unfit to treat patients.

9.     In 1979, after receiving repeated complaints that Anderson was sexually assaulting male students during medical examinations on campus, U of M did nothing but transfer Anderson from his position as the Director of University Health Services ("U of M Health Services") to Senior Physician with U of M Health Services.

10.     U of M also allowed Anderson to continue with his position as Athletic Physician, where he repeatedly sexually assaulted male student-athletes until he retired in 2003. U of M student-athletes were required to see Anderson as part of their athletic training.

11.     U of M had and has a duty to protect the health and safety of its students, and this duty includes protecting them from sexual assaults by U of M employees, and responding properly if a sexual assault does occur.

12.     U of M violated this duty by failing to implement and enforce appropriate policies and procedures to prevent, and properly respond to, sexual assaults of its students; by ignoring and concealing complaints of sexual assaults by Anderson; by retaliating against those who did report misconduct by Anderson; and by failing to properly supervise Anderson and terminate him.

13.     As a result of U of M's conduct, Plaintiffs and Class members

suffered and continue to suffer severe emotional and physical pain, including

shock, emotional distress, physical manifestations of emotional distress including

embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment

of life; have suffered and continue to suffer and were prevented and will continue

to be prevented from performing daily activities and obtaining the full enjoyment

of life; will sustain loss of earnings and earning capacity, and/or have incurred and

will continue to incur expenses for medical and psychological treatment, therapy,

and counseling.

## I.    **JURISDICTION AND VENUE**

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C.

§ 1331, because this action arises under the laws of the United States. This Court

also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of

2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims

asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules

of Civil Procedure; there are likely thousands of proposed Class members spread

throughout the country; and the aggregate amount in controversy exceeds the

jurisdictional amount of $5,000,000.00.

15.     Venue is proper in this District under 28 U.S.C. § 1391(a)–(d)

because, *inter alia*, substantial parts of the events or omissions giving rise to the

claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

16.     At all relevant times, Anderson maintained an office at U of M in Ann Arbor, Michigan, where he saw Plaintiffs and all of his student-patients.

## II.     PARTIES

### A.     Plaintiffs

#### i.     John Doe

17.      John Doe is a resident of the State of New York and a citizen of the United States.

18.     John Doe attended U of M as an undergraduate on an academic scholarship from 1989 to 1993.

19.     While at U of M, he participated on the football team.

20.     Through his participation on the football team, John Doe was required to see Anderson approximately six times for physicals and medical ailments.

21.     He was sexually assaulted by Anderson at every visit.

22.     At each visit, Anderson ordered John Doe to remove his pants or shorts and underwear. Then, Anderson examined, handled, and fondled John Doe's penis and testicles. Anderson next repositioned John Doe, after which Anderson digitally penetrated John Doe's anus and probed his interior, causing him shock, pain, and shame.

23.     Before Anderson, no person had penetrated John Doe's anus. As such, it was very confusing and disorientating.

24.     John Doe trusted Anderson and U of M to protect him. Despite his shock, pain, and trauma, he thought Anderson's abuse was part of normal medical protocol. John Doe believed that U of M's prestigious football team would provide the best possible doctors to care for its players. And, Anderson's abuse all occurred under the pretext of a necessary physical examination. John Doe thus believed Anderson must have had a legitimate medical purpose for his examinations.

25.     Plaintiff John Doe understood that he would not receive clearance from Anderson to participate in U of M's football program if he did not submit to Anderson's "exams."

26.     John Doe was not aware whether other student-patients had similar experiences with Anderson.

27.     During the winter of John Doe's junior year, he left the football team briefly in order to avoid the discomfort associated with another exam by Anderson. That too filled him with shame. He rejoined the team four to five weeks later.

28.     U of M's football team motto was "Those Who Stay Will be Champions." That said, John Doe played through several injuries without reporting them, in order to avoid seeing Anderson.

29.     Throughout John Doe's senior year, he suffered from "turf burn" (a severe "rug burn" resulting from the removal and burning of layers of skin caused by sliding across artificial grass surface at high speed). John Doe's wound, which was on his left elbow and forearm, would not heal as he continued to play and was regularly tackled on it. Every day, after a sweat and dirt filled practice, the wound bled and oozed until it became infected. John Doe discovered the wound was infected when he noticed a few dozen bumps appear near his wound. Team trainers immediately recognized the bumps as a sign of infection and instructed John Doe to visit Anderson for antibiotics. Despite believing Anderson's examinations had legitimate medical purposes, John Doe avoided seeing Anderson because the examinations made him feel confused and uncomfortable. Instead, he asked if the trainers could simply call Anderson for a prescription. The trainers informed John Doe he had to see Anderson in person to obtain the antibiotics. John Doe then waited another week, hoping the wound would heal itself and he could avoid seeing Anderson. The infection only got worse.

30.     Eventually, because the team's trainers threatened to pull John Doe from practice if he did not address his infection, he was forced to see Anderson for antibiotics. As typical, Anderson proceeded to fondle John Doe's genitals and digitally penetrate his anus. After Anderson removed his finger from John Doe's anus, he offered a pretext for the anal probe, saying "well, it doesn't seem to have

spread." John Doe thus continued to believe Anderson's conduct was medically necessary.

31.    John Doe continues to suffer damages as a result of his abuse by Anderson. He has difficulty trusting people. Doctor visits remain anxiety inducing, often causing him to postpone appointments repeatedly.

32.    His abuse by Anderson continues to cause him numerous emotional and psychological trauma. John Doe suffers from generalized anxiety disorder, for which he sees a therapist and psychiatrist.

33.    John Doe deeply loves U of M and its football team and is proud to have been an honor student and someone who wore the winged helmet.

### ii.    Richard Roe

34.    Richard Roe is a resident of the State of California and a citizen of the United States.

35.    Richard Roe attended U of M as an undergraduate in the 1980's and participated in varsity athletics for four years.

36.    Through his athletic participation, Richard Roe was required to see Anderson four times for annual physicals and was sexually abused by Anderson at every visit.

37.    During the course of each physical examination, Anderson touched, fondled, and manipulated Richard Roe's genitals extensively. Anderson always

offered a rationale for the abuse, claiming he was demonstrating a way to "self-check for testicular cancer."

38.     Richard Roe was surprised, disoriented, and embarrassed by the experience, but he trusted Anderson's representation that the exams were valid medical procedure.

39.     Richard Roe understood that he would not receive clearance from Anderson to participate in U of M's varsity athletic programs if he did not submit to Anderson's "exams."

40.     Residual discomfort about the visits to Anderson continues to trouble Richard Roe and cause him unease. He feels uncomfortable seeing physician for physical exams. He has struggled with trust and boundaries, finding himself questioning medical procedures. As a result, he has on several occasions, gotten into arguments with different physicians about minor things. All of the above causes Richard Roe stress and mental suffering.

41.     Richard Roe has great respect for U of M and its proud athletic tradition. He feels the lessons and friendships formed during this time have had a major impact on his life. He is grateful for his time at U of M, and saddened this formative and powerful period was tarnished by his interactions with Anderson.

### iii.    Anonymity

42.    Plaintiffs file this case anonymously because of the extremely sensitive nature of the case as Plaintiffs are survivors of sexual assault, and the suit will require disclosure of information "of the utmost intimacy"; Plaintiffs are therefore entitled to protect their identity in this public filing by not disclosing their names. *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004) (citing *Doe v. Stegall*, 653 F.2d 180, 185–86 (5th Cir. 1981)).

### B.    Defendants

43.    Defendant U of M was at all relevant times and continues to be a public university organized and existing under the laws of the State of Michigan.

44.    At all relevant times, including the years 1968 to 2003, Anderson was acting within the course and scope of his employment or agency with U of M.

45.    The Regents of the University of Michigan ("Board of Regents") is a body corporate, with the right to be sued, vested with the government of the university. M.C.L. § 390.3 and 390.4.

46.    The Board of Regents is the governing body of U of M.

47.    The Board of Regents is responsible for setting and approving all public policy at U of M, including sex discrimination policy.

48.    Defendants U of M and Board of Regents are collectively referred to herein as the "Defendants."

49.     Defendants receive, and at all relevant times received, federal financial assistance and are therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq.

## III.   FACTUAL ALLEGATIONS

### A.     Anderson's History of Employment and Sexual Predation at U of M.

50.     From 1968 until 2003, Anderson was employed by U of M as a physician.

51.     Throughout his employment at U of M, Anderson treated students on U of M's Ann Arbor campus.

52.     During his tenure at U of M, Anderson held numerous titles, including Director of Health Services, Senior Physician with Health Services, and Athletic Senior Physician.

53.     In his roles with U of M Health Service, Anderson regularly saw male students as patients for general health-related inquiries, medical ailments, physical examinations, prescription drug consultations, and military draft consultations.

54.     In his role as Athletic Physician, Anderson treated members of the wrestling, football, and hockey teams for nearly every medical ailment, complaint, and injury as their U of M -assigned internist. He served as one of their first medical points of contact no matter the injury or ailment at issue, including everything from a cold to broken bones. Indeed, student-athletes were required to

- 11 -

see Anderson even when they were not injured; regular physicals and checkups with Anderson were required for all student-athletes.

55.    In all of these roles, and throughout the entirety of his employment with U of M, Anderson regularly and repeatedly sexually assaulted, abused, and molested male students by engaging in nonconsensual sexual touching, assault, and harassment, including but not limited to medically unnecessary genital manipulation and digital anal penetration.

**B.    U of M Students (And Their Parents) Entrusted Their Medical Care to U of M.**

56.    Experts believe health is an important factor for academic achievement in higher education.[3] "Health complaints limit students' capacity to perform adequately at university."[4] Thus, a university's promotion of health and well-being of its students promotes effective learning.[5]

57.    Trust is essential to both physician and patient.[6] "Without trust, how could a physician expect patients to reveal the full extent of their medically

---

[3] Walid El Ansari & Christiane Stock, *Is the Health and Wellbeing of University Students Associated with their Academic Performance?* 7 INT'L J. ENVTL. RES. PUB. HEALTH 509, 509–527 (2010) (citations omitted).

[4] *Id.*

[5] *Id.*

[6] Dorr Goold, *supra* note 1.

relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[7]

58.    "Presumed consent is a critical manifestation of trust that makes possible much of routine doctor visits."[8] Absent a presumption of trust, patients might avoid essential medical care.[9]

59.    "Important as it is to measure trust in individual clinicians and the actions and circumstances that affect it, it is equally important, in today's health system, to study (empirically and normatively) trust and trustworthiness in organizations and institutions."[10]

60.    Knowing young male students would place their trust in its physicians, Defendants had a duty to ensure that Anderson used his trusted position and the safe confines of a doctor's exam room in U of M's Athletic Department and U of M Health Services consistent with the standard of care and certainly not to abuse that trust through the molestation of students.

C.    U of M Betrayed Students' Trust and Demonstrated a Pattern of Indifference to Sexual Harassment and Abuse.

61.    Throughout Anderson's tenure at U of M, beginning in 1968, U of M repeatedly received complaints about Anderson's sexual misconduct and predation.

---

[7] *Id.*

[8] *Id.* (citing Ruth Faden & Tom Beauchamp, A HISTORY AND THEORY OF INFORMED CONSENT 274–80 (Oxford Univ. Press 1986)).

[9] *Id.*

[10] *Id.*

But U of M just concealed Anderson's misconduct and continued to allow Anderson access and opportunity to abuse U of M students until he voluntarily retired in 2003. In so doing, U of M put its own reputation above the safety of its students.

62.     Moreover, U of M's lack of and/or failure to enforce adequate policies and procedures for the proper response to on-campus sexual assaults of its students exacerbates and amplifies the trauma of the actual assault due to institutional betrayal.

63.     The term "Institutional Betrayal" refers to wrongdoings perpetrated by an institution upon individuals dependent on that institution, including failure to prevent or respond supportively to wrongdoings by individuals (e.g. sexual assault) committed within the context of the institution.[11]

64.     Indeed, U of M's culture of indifference to the safety and well-being of its students has caused sexual violence to flourish at U of M for decades. This toxic culture continues to thrive to this day.

---

[11] Jennifer J. Freyd, *Institutional Betrayal and Institutional Courage*, https://dynamic.uoregon.edu/jjf/institutionalbetrayal/; *See also* Carly Parnitzke Smith & Jennifer J. Freyd, *Institutional Betrayal*, 69 AM. PSYCH. ASSOC. 575 (2014).

### 2.   U of M learned as early as 1968 of Anderson's sexual predation of students.

65.   In 1968, a then-U of M student, Gary Bailey went for an examination by Anderson, which he later described to the Detroit News as "very traumatic."[12]

66.   Bailey states "he (Anderson) had me drop my pants, he felt my penis and genitals, and subsequently, he (Anderson) wanted me to feel his (Anderson's) penis and genitals." Bailey further states, "Back then you did not question a doctor's authority . . . He asked me to pull on his penis."[13]

67.   Bailey filed a written complaint with the U of M Health Service and filled out a form, complaining that Anderson had dropped his pants and asked him to fondle his genitals during the exam.

68.   No one from U of M Health Services or any other U of M department followed up with Bailey or contacted him as part of an investigation into Bailey's written sexual assault complaint.

69.   On information and belief, U of M never acted on and/or investigated Bailey's complaint against Anderson.

---

[12] Kim Kozlowski, *Alum Says He Told UM Of Doctor's Sex Abuse In '68 But Never Got A Response*, THE DETROIT NEWS (last visited March 3, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/02/20/alum-says-he-told-university-michigan-about-doctor-sex-abuse/4817480002/, Exhibit A.
[13] *Id.*

### 3. U of M was warned again in 1975 about Anderson's sexual predation.

70.     In 1975, U of M student and scholarship member of U of M's

wrestling team, Tad Deluca, gave notice of Anderson's sexual misconduct in a 9-

page letter to U of M's head wrestling coach, Bill Johannesen, complaining that

"Something [was] wrong with [Anderson]" and "[r]egardless of what you are there

for, Dr. Anderson makes you drop your drawers."[14]

71.     Neither U of M, Coach Johannesen, nor any agents of U of M

investigated Mr. Deluca's complaints about Anderson's sexual assaults; instead

Defendants retaliated against Deluca by stripping him of his athletic scholarship

and kicked him off the wrestling team.

72.     Deluca appealed to then Athletic Director, Don Canham, and provided

him with a copy of the letter sent to Coach Johannesen, giving Director Canham

notice of the allegations against Anderson.

73.     Director Canham did not investigate the sexual abuse complaints

against Anderson, and instead, upheld the revocation of Mr. Deluca's athletic

scholarship.

---

[14] David Jesse, *Former U-M Wrestler: I blew whistle on U-M doctor in 1975, was dismissed from team*, DETROIT FREE PRESS (last visited March 3, 2020), https://www.freep.com/story/news/education/2020/02/27/robert-anderson-university-of-michigan-tad-deluca-sex-abuse-scandal/4890575002/, Exhibit B.

74.     Mr. Deluca had to hire an attorney and appeal to U of M's Board of Intercollegiate Athletics to have his scholarship reinstated.

75.     Johannesen admits to hearing jokes about Anderson's proclivity to "examine" the genitals of male student-athletes. According to Johannesen, "[t]he joke was that you go to see [Anderson], and you have a sore elbow, he would say, 'OK, pull your pants down."[15]

76.     That same year, 1975, a then-graduate student was sexually abused by Anderson and complained to U of M staff. The student saw Anderson at U of M Health Services and during the course of his visit, Anderson inserted his fingers into the student's rectum without medical purpose. The student complained loudly to the desk clerk and an administrator, both of whom dismissed him and ordered a security guard to escort him out of U of M Health Services. U of M failed to investigate the student's allegation against Anderson.

### 4.     U of M concealed Anderson's sexual predation upon receiving credible allegations in 1979.

77.     In 1979, then-U of M Vice President of Student Life, and direct supervisor of Anderson, Tom Easthope learned of credible allegations that

---

[15] Kim Kozlowski, *Ex-Wrestler Says UM Ignored His Abuse Claims, Kicked Him Off Team*, THE DETROIT NEWS (last visited March 3, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/02/27/former-university-michigan-athletes-abuse-allegations-robert-anderson/4869148002/, Exhibit C.

Anderson had assaulted several members of the gay community at U of M and was "fooling around with male students" in the exam room.[16]

78.     According to Easthope, upon hearing the allegations he "walk[ed] across the campus to Health Services to fire [Anderson]." When he confronted Anderson about the allegations, Anderson did not deny them.[17]

79.     Easthope initially told detectives that he fired Anderson "on the spot."[18] Shortly thereafter, however, Easthope said he may have allowed Anderson to resign. He told the officers he believed Anderson had returned to private practice.[19]

80.     In reality, Anderson was never fired and did not leave U of M until retirement in 2003.

81.     On July 28, 2020 and August 4, 2020, Mr. Easthope provided the following testimony, under oath:

    a.     Easthope was the Associate Vice President of Student Services and his supervisor was Henry Johnson, Vice President of Student Services.

    b.     His boss, Henry Johnson, reported directly to the President of the U of M. *See* Deposition of Thomas Easthope taken in this matter on July 28, 2020 and August 4, 2020 at 29:17–19.

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

c.      Easthope acted as "COO" of Student Services and Johnson acted as "CEO" of Student Services. *Id.* at 30:5–10. Easthope had access to and the "ear" of U of M presidents, such as President Robben Fleming, for whom U of M's administration building is named. *Id.* at 37:9–10 ("President Fleming relied on me a great deal to communicate with students.").

d.      In his capacity as Associate Vice President of Student Services, Easthope supervised approximately 1600 U of M employees. *Id.* at 31:11–17].

e.      Mr. Easthope had no disciplinary or other issues with Anderson before he learned Anderson was sexually abusing students in the University Health Service exam rooms. *Id.* at 50:1–3.

f.      Easthope was aware that Anderson worked with U of M's Athletic Department. *Id.* at 53:4–7.

g.      Easthope described Anderson as "authoritarian," *Id.* at 51:17, and "in a position of supreme authority and power" vis-à-vis U of M students. *Id.* at 332:10–11.

h.      Easthope fired Anderson based on a report that Anderson was "fooling around with boys"—i.e., abusing students—in the exam room of the University Health Service. Hearing about the abuse was "absolutely" the worst employee incident he had ever encountered in his professional career. *Id.* at 57:19–22. It was something that "just shocked the hell out of [him]." *Id.* at 60:18–19. "[I]t was a significant event in [his] life…it infuriated [him]." *Id.* at 63:14–18.

i.      Easthope was not aware of U of M having any policies or procedures concerning how incidents of sexual abuse on campus should be reported or handled. *Id.* at 245:21-246:11.

j.      Easthope was infuriated to learn Anderson "was abusing a vulnerable population," so he marched over to Anderson's office intending to fire him. *Id.* at 62:26–63:1; 63:20–21.]

k.      Easthope was so "furious walking across campus (to fire Anderson)" that he considers it "a very, very significant point in [his] life and [] career[.]" *Id.* at 64:14–17.

- 19 -

l.   Firing, "somebody who has got this aura of being a physician and being the head of Health Services" took "some guts, as [he] recall[s]." *Id.* at 87:3–6. Indeed, Anderson was Vice President Johnson's private doctor. *Id.* at 52:14–18.

m.   Easthope had the authority to fire Anderson. *See id.* at 177:18–178:1.

n.   Anderson was the only division head (of Student Services) that Easthope had ever fired. *Id.* at 68:10–12.

o.   Yet Easthope does not recall preparing or ever seeing any written documentation effecting or regarding Anderson's firing. *Id.* at 15–17.

p.   When confronted with the fact that Anderson stayed employed by U of M for 23 years after Easthope fired him, Easthope agreed that overriding his termination decision was wrong: "I believe it would be wrong, yes…it was moral authority [to fire Anderson] so I gotta get rid of this guy." *Id.* at 88:25–89:3.

q.   As Easthope's direct supervisor, Johnson also had the authority to fire Anderson after learning of Anderson's misconduct from Easthope. However, despite knowing about Anderson's history of abuse, Johnson "overrode" Easthope's firing of Anderson. *Id.* at 130:10–12; 239:13–22.

r.   Easthope also suggested that Athletic Director Don Canham was involved in overriding Easthope's decision to fire Anderson. *Id.* at 109:25-110:2 ("Don Canham was a bigger man than Henry Johnson and probably 90 percent of the people on the hill."); *id.* at 336:6–7 (Canham was "a voice to be reckoned with at the University of Michigan.").

s.   Still, Easthope was "stunned" that Anderson remained employed by U of M for 23 years after Easthope fired him. *Id.* at 162:22–23.

t.   It was predictable that, if Anderson "were allowed to stay . . . the number [of abused students] would go up." *Id.* at 89:12–15.

u.    Easthope considers Anderson's sexually predatory conduct comparable to the conduct of Dr. Larry Nassar at Michigan State University. *Id.* at  215:10–14 ("when the Nassar thing came up . . . I think I may have said, you know, that we had to get rid of Bob Anderson because of that").

v.    Easthope had the authority to take corrective measures to ensure that Anderson was not able to abuse students. *See id.* at 177:18–178:1. While he attempted fire Anderson, he failed to report Anderson's misconduct to the proper channels and failed to make sure Anderson's employment at U of M was in fact terminated.

w.    Easthope never asked University Health Services, the Ann Arbor Police, or the Washtenaw County Prosecutor's Office to investigate the extent of Anderson's abuse. And, he failed to notify Michigan's Department of Licensing and Regulatory Affairs ("LARA")—the state professional "licensing agency"— or the U of M Medical School about Anderson's sexual abuse of male students. *See generally*, *id.* at 219–220.

x.    Similarly, Easthope did not inform U of M's Athletic Department about Anderson's sexual abuse of male students or Anderson's "termination," despite knowing "that [Anderson] was working with the athletic department[.]" Easthope figured that because the Athletic Department was out of his "sphere of influence and nothing that [he] had any input about," that it was not something he needed to be "terribly concerned about." *Id.* at 53:4–8.

y.    Easthope told his boss, Henry Johnson, a person who directly reported to the President of U of M, that Anderson was abusing students. *See id.* at 303:25–304:1("I didn't just go knocking off people without Henry knowing about it); 323:11–14 ("(B)ut I did tell him what I knew about [the abuse]").

z.    When asked about his failure—despite the power of his position—to do more, Easthope testified, "We live in a different time, and it's not like that today. To go out and make accusations about people, and 'this guy is against gays' or something wouldn't been very nice to anybody, including

myself, so it is wasn't something you go out and broadcast. I just didn't want to have to deal with that kind of problem." *Id.* at 165:25–166:7.

aa. Indeed, Easthope testified he had other priorities more important than ensuring Anderson left campus in order to protect future students from being abused by Anderson: "So in retrospect, it doesn't sound very forgiving of me, but I had to move on, I had a lot of things going on every day, and you know, I suppose you experience having to make a decision and move on. I can't explain it any other way." *Id.* at 186:18–23.

bb. Easthope expressed sympathy for students who were abused but fearful of retaliation if they told anyone about Anderson's abuse: "If you were a young athlete and you wanted to perform, you didn't want to get yourself in trouble with anybody, and it's hard – it would be hard to know that you got yourself in trouble because of some guy screwing around with you." *Id.* at 171:1–10; *see also*, *id.* at 171:11–14 ("I can tell you how I would feel, but I'm not 100 athletes that had their scholarships on the line if they reported somebody who was revered by their coaches.").

82.    Easthope's affirmative failure to ensure Anderson left U of M's employment and his affirmative failure to confront his superiors after one or some of them overrode his termination of Anderson, fraudulently concealed the existence of Plaintiffs' claims—that Anderson's acts done in the guise of medical treatment were in fact sexual assaults—and concealed the identities of liable parties—i.e., U of M. The foregoing: (a) prevented the discovery by Plaintiffs and Class members that Anderson's conduct was sexual assault and not medically necessary; and (b) hindered all future victims of Anderson from learning that Anderson sexually assaulted students under the guise of medical treatment.

83.     Similarly, Johnson's reversal of Anderson's firing affirmatively: (a) prevented the discovery by Plaintiffs and Class members that Anderson's conduct was sexual assault and not medically necessary; and (b) hindered all future victims of Anderson from learning that Anderson sexually assaulted students under the guise of medical treatment.

84.     Indeed, according to U of M human resource records, instead of terminating Anderson from the U of M, U of M transferred him from Director of Health Services to a position as Senior Physician with Health Services, effective January 14, 1980. The reason for his transfer as stated in Anderson's personnel file was "resuming former position."[20]

85.     Despite U of M's knowledge of Anderson's misconduct, Anderson continued to work as a physician with U of M and as a physician in U of M's Athletic Department. Indeed, according to longtime U of M athletic trainer Russell Miller, after Anderson's transfer from U of M Health Services Director, Athletic Director Canham, a legendary and powerful figure at the U of M, "worked out a deal" to increase Anderson's role in the Athletic Department.[21]

U of M, through its most senior administrators, employed a false artifice and misrepresentation that Anderson was an ethical and competent doctor. In that

---

[20] Affidavit for Search Warrant by Detective Ryan A. Cavanaugh, dated November 15, 2018, Exhibit D.
[21] Officer Narrative Dated November 9, 2018, U of M Division of Public Safety & Security, Exhibit E.

regard, U of M continued to hold Anderson out as a leader in its healthcare community U of M U of M U of M and praised Anderson in its publication, Volume III of the President's Report of The University of Michigan for 1979–1980.[22]

86.     The U of M publication states in its "Acknowledgement" preface: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine . . . his many contributions to health care are acknowledged. . . . The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him." It further confirms that after his transfer, Anderson "continue[d] as a senior physician on the medical staff" at U of M.[23]

87.      Thereafter, Anderson had free rein to abuse thousands of male students with impunity, including Plaintiffs and Class members.

**5.     U of M continued to conceal Anderson's sexual predation upon receiving further credible allegations.**

88.     Even upon learning of more allegations, U of M continued to protect Anderson and its own reputation instead of the safety of its students.

---

[22] Excerpts from *President's Report of The University of Michigan*, Vol. III, (1979–1980), Exhibit F.
[23] *Id.*

89.     In 1994, the predecessor of LARA received a complaint about a 1973 incident, where Anderson fondled the genitals of an undergraduate man to the point of ejaculation. In the ordinary course of a reported sexual assault by a regulated professional, LARA would have contacted U of M as Anderson's employer.

### D.     Unlike U of M, Anderson's Victims Did Not and Could Not Reasonably Know Until February 2020 That U of M Put Them at Risk of Sexual Assault—and Allowed Them to Be Sexually Assaulted—by Anderson.

90.     Although Anderson's victims were confused, uncomfortable, and traumatized following their encounters with Anderson, they did not understand the nature of Anderson's abuse, or rather that his actions were not part of necessary medical treatment but rather sexual assault to satisfy Anderson's sexual desires.

91.     Despite being uncomfortable with Anderson's "examinations" and "treatments," student-patients were led to believe by those with positions of authority, including Athletic Director Canham, coaches and trainers, and Anderson himself, that everything Anderson did was medically necessary or helpful.

92.     Anderson thus took advantage of the inherent power imbalance between a physician and young patient by making completely inappropriate behavior seem medically legitimate.

93.     Anderson's victims did not know, and could not reasonably understand that they were being sexually assaulted at the time Anderson abused them.

94.     As a result of this power imbalance, culture of retaliation, and disguising of abuse as legitimate medical procedures many of Anderson's victims stayed silent about their abuse for years.

95.     On or about July 18, 2018, U of M alumnus and victim of Anderson, Tad Deluca, sent a letter to the current U of M Athletic Director, once again notifying U of M —as he did in 1975—of Anderson's sexual misconduct.

96.     It was not until U of M received Deluca's letter in 2018—50 years after hiring Anderson, 50 years after U of M received first complaint about Anderson's misconduct, 43 years after Deluca's initial complaint, 15 years after Anderson's retirement, and 10 years after Anderson's death—that U of M requested police open an investigation into Anderson's misconduct.

97.     Still, U of M did not take further action to notify former students and/or the public about the allegations  and/or investigation until almost two years later.

98.     On February 19, 2020, U of M, for the first time, publicly announced it had launched investigations into Anderson's sexual misconduct, admitting five former students had made abuse allegations.

99.    The next day, February 20, 2020, U of M made its first public

acknowledgement of Anderson's abuse and its knowledge thereof. In a prepared

statement, U of M President Mark Schlissel admitted, "[U of M ] police found

indications that [U of M] staff members were aware of rumors and allegations of

misconduct during  Anderson's medical exams."[24]

### E.    Anderson's Victims Have Suffered and Will Continue to Suffer Damages from U of M's Institutional Betrayal.

100.    Symptoms of male sexual abuse on male adults can last for decades

and affect their lives in many ways from causing sexual dysfunction and the

inability to engage in close relationships with others to confusion about sexual

identity, embarrassment, and depression.[25]

101.    Psychological damage from sexual abuse is especially harmful when

the perpetrator is known and trusted by the victim.[26]

102.    When sexual abuse is perpetrated by a medical provider, patients

often lack the ability to comprehend the abuse due to the provider's position of

---

[24] University of Michigan President, Mark Schlissel Statement on Sexual Misconduct at February 2020 Board of Regents Meeting (February 20, 2020).
[25] See Male Victims of Male Sexual Assault: A Review of Psychological Consequences and Treatment (Sexual and Relationship Therapy, August 2001); Effects of Sexual Assaults on Men: Physical, Mental and Sexual Consequences (International Journal of Men's Health, Vol. 6, No. 1, Spring 2007, pp. 22–35)
[26] See Integration of Sexual Trauma in a Religious Narrative:  Transformation, Resolution and Growth among Contemplative Nuns (Transcult Psychiatry, Feb. 2013; 50 (1): 21–46); Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond (EVAW's OnLine Training Institute, May 2019, p. 34).

access, trust and authority and commonly suffer from emotional distress,

humiliation, and the inability to trust medical care providers or the medical care

professional generally.[27]

103.   Plaintiffs and Class members to this day suffer continuing trauma as a

result of the Defendants' Institutional Betrayal and failure to implement proper

protective measures. Without implementing the proper policies and procedures to

protect students from serial sexual predators, Plaintiffs and Class members will

continue to suffer damages as a result of Defendants' Institutional Betrayal.

## IV.   <u>FRAUDULENT CONCEALMENT TOLLING</u>

104.   Under M.C.L. § 600.5855, statutes of limitations are tolled when "a

person who is or may be liable for any claim fraudulently conceals the existence of

the claim or the identity of any person who is liable for the claim from the

knowledge of the person entitled to sue on the claim[.]"

105.   Both Anderson and the Defendants, through their employees, agents,

and representatives, including but not limited to athletic coaches, trainers, and

directors, fraudulently concealed the existence of Plaintiffs and Class members'

claims by (1) concealing from Plaintiffs and Class members that the Defendants

and their employees, agents, and representatives were aware of Anderson's sexual

---

[27] *See Above All, Do No Harm: Abuse of Power by Health Care Professionals*, by
Kathleen S. Lundgren, Wanda S. Needleman, Janet W. Wohlberg (2004), available
at https://www.therapyabuse.org/p2-abuse-of-power.htm

abuse and did nothing to stop it; (2) affirmatively telling Plaintiffs and the class that Anderson's procedures were normal and/or medically necessary, (3) publishing a statement that Anderson was a renowned physician to be trusted and respected in a publication delivered to and read by university students, (4) concealing from Plaintiffs and Class members that U of M was aware of Anderson's abuse since at least 1968, thereby concealing U of M's identity from Plaintiffs and Class members as a "person who is liable for the claim," as set forth in more detail below.

106.   Defendants, through their employees, agents, and representatives, including but not limited to athletic coaches, trainers, athletic directors, other athletic department representatives, and members of U of M's administration, made affirmative representations to Plaintiffs and Class members, referred to collectively as "Defendants' representations," that:

> a.   Anderson was to be trusted and not questioned, and his devotion to medical care at U of M was worthy of public recognition and celebration, stating: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him," published in the Acknowledgement preface of Volume III of the President's Report of The University Of Michigan for 1979–1980;

b. Anderson was to be trusted and not questioned as his services were worthy of recognition by U of M dedicating "the Annual Report to him" even though U of M and its executives knew that Easthope had intended to fire Anderson for his inappropriate sexual conduct toward male students;

c. Anderson's genital groping and anal penetrations were normal, medically necessary, proper, appropriate, legitimate, and/or medically beneficial, generally;

d. Anderson's genital groping and anal penetrations were normal, medically necessary, proper, appropriate, legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 23, with no reported issues related to genitals and/or anus;

e. U of M student-athletes required to be subjected to Anderson's treatments as they were normal, medically necessary, proper, appropriate, legitimate, and/or medically beneficial;

f. Anderson would treat their ailments and injuries in an ethical and competent manner, and therefore non-criminal manner;

g. Anderson was not sexually assaulting Plaintiffs and Class members;

h. Plaintiffs and Class members should not question and/or report the conduct to appropriate authorities; and

i. there was no possible cause of action against Anderson and/or U of M.

107. Defendants' representations were false. Defendants were aware that genital manipulation and/or digital anal penetrations are almost never needed for any physical or medical treatment of healthy college-aged males.

108.   Defendants knew the representations were false. Defendants received several complaints about Anderson's sexual assaults prior to Plaintiffs and Class members arriving on campus.

109.   Defendants made the material representations, knowing they were false and/or made the material representations recklessly, without any knowledge of their truth and as a positive assertion, in that they had previously received strikingly similar complaints of abuse by Anderson from other students and student athletes and knew that the appropriateness of his genital and anal examinations had been questioned in the past.

110.   Defendants' representations were material, in that had Plaintiffs and Class members known the representations were false, they would have stopped seeking treatment from Anderson immediately.

111.   Defendants' representations were made with the intent that Plaintiffs and Class members would rely on them as U of M sought to prevent Plaintiffs and Class members from discovering their causes of action against Anderson and/or U of M.

112.   Plaintiffs and Class members did, in fact, rely on Defendants' representations; indeed, the representations led Plaintiffs and Class members to continue seeking treatment from Anderson, and had they known the

representations were false, Plaintiffs and Class members would have stopped treating with Anderson.

113. Defendants concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of fraud, in that they:

a. Refused to terminate Anderson and thus validated him through continued employment as a physician with one of the world's great institutions of higher learning;

b. Affirmatively lied in written publications about Anderson "resigning" from U of M Health Services when he was fired, and then retained but demoted him, for assaults on male students;

c. Ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Anderson's genital and anal examinations; and

d. Retaliated against those who did report Anderson's misconduct.

114. Defendants knew, and Plaintiffs and Class members were in fact, particularly susceptible to believing Defendants' representations because:

a. Plaintiffs and Class members were young and inexperienced;

b. Defendants' representations were made within the context of a pervasive culture created by statements made by representatives of U of M, including coaches, trainers, directors, and other leaders of the Athletic Department, that Anderson's treatments were necessary and Anderson was a competent and ethical physician, to be trusted and never questioned;

c. Plaintiffs and Class members largely had no prior experience with legitimate and appropriately performed medical treatments that involve anal penetration and/or genital manipulation, so it

was impossible for his victims to differentiate a legitimate and appropriately performed anal penetration and/or genital manipulation from sexual assault;

d.     Plaintiffs and Class members could not have possibly known because there were no parents, coaches, guardians, caregivers, and/or other medical professionals in the room during the sexual assaults to observe, question, and/or discover the assaults;

e.     Plaintiffs and Class members were intimidated by Anderson's notoriety and reputation and therefore believed his representations;

f.     Plaintiffs and Class members trusted Anderson due to his position of trust and authority, and reputation;

g.     Plaintiffs and other U of M student-athletes were pressured to submit to Anderson's sexual assaults without question in order to keep their scholarship, stay on their teams, and remain at U of M to earn college degree;

h.     Plaintiffs and Class members victims were could not have been aware of other allegations of abuse because Anderson and U o f M concealed any such allegations and fostered a culture that normalized Anderson's treatments; and

i.     There were no public accounts of Anderson's sexual misconduct;

115.   Accordingly, Plaintiffs and Class members did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Defendants until media reports of Anderson's serial sexual assaults beginning on February 19, 2020.

116.   Because U of M had a fiduciary duty to Plaintiffs and Class members, the failure to disclose material information is also fraudulent.

117.   At all times pertinent to this action, the sports medicine trainers, trainers, employees, staff, managers, supervisors, coaches, and directors of Defendants were agents, apparent agents, servants, and employees of Defendants and operated within the scope of their employment and their fraudulent concealment is imputed to Defendants.

118.   In addition to affirmative false representations, U of M coaches, officials, agents, and representatives failed to disclose to Plaintiffs and Class members that they were being sexually abused and that Anderson had a history of committing sexual assaults in the guise of medical treatment.

119.   Defendants' representations caused Plaintiffs and Class members to be exposed to the risk of sexual assault by Anderson, and to actually be sexually assaulted by Anderson.

120.   Defendants are equitably estopped from relying upon a statute of limitations defense because of their gross negligence and silence as well as their active and deliberate efforts to deceive Plaintiffs and the Class Members and to conceal their unlawful and grossly negligent conduct.  Through their gross negligence and silence, Defendants encouraged and influenced Plaintiffs and Class Members to act to their disadvantage by telling them that their complaints about Anderson were unfounded, encouraging them to continue seeing Anderson professionally and making them feel ashamed, such that Plaintiffs and Class

Members could not discover the nature, scope, and magnitude of Defendants' misconduct.  As set forth herein, Defendants also took active steps to misrepresent material facts.

121.   Plaintiffs and Class Members' claims should be equitably tolled because any alleged failure to meet any deadline unavoidable arose from circumstances beyond Plaintiffs and Class Members' control:  (a) Defendants concealed material facts regarding Anderson's misconduct and for decades, Defendants misrepresented and fraudulently concealed this activity and the substantial risks posed by that misconduct;  Defendants intended for the public, including this Plaintiffs and Class Members to be deceived by this fraud such that Anderson's conduct remained unstopped for decades and the repercussions of his misconduct were not dealt with to the detriment of Plaintiffs and Class Members; As set forth herein, Defendants knew the actual facts, to wit that Anderson used his position as a physician to sexually assault the students under his care and that the Defendants knowingly did nothing to stop it.

## V.    <u>CLASS ALLEGATIONS</u>

122.   Plaintiffs bring this action pursuant to Rules 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and the following Class:

> All students who were seen by Anderson at U of M
> between 1968 and 2003.

123.   The Class consists of thousands of men, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by U of M.

124.   Plaintiffs' claims are typical of the Class. Plaintiffs and Class members' claims and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of U of M's failure to implement and enforce appropriate policies and procedures to prevent and properly respond to sexual harassment and assault; and U of M's culture of covering up for and protecting Anderson instead of protecting its students.

125.   There are many questions of law and fact common to Plaintiffs' claims and the Class, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

126.   Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

  a.   Whether Anderson engaged in sexual harassment, assault, and battery;

  b.   Whether Anderson's sexual harassment, assault, and battery was committed within the scope of his employment at U of M ;

  c.   Whether Defendants had knowledge of Anderson's sexual harassment, assault, and battery;

    d.      Whether Defendants facilitated Anderson's pattern and practice of sexual harassment, assault, and battery;

    e.      Whether Defendants or Anderson engaged in conduct designed to ignore or suppress complaints or reports regarding Anderson's conduct;

    f.      Whether U of M negligently retained or supervised Anderson;

    g.      Whether Defendants ratified Anderson's conduct; and

    h.      Whether U of M is responsible for Anderson's conduct under the doctrine of *respondeat superior.*

127.   A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The highly sensitive and private nature of the facts involved here counsels toward providing a class vehicle to adjudicate these claims. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate these claims. As a result, it would be impracticable for Class members to seek redress individually. Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

128.   Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in

prosecuting complex litigation and class actions, including sex abuse class actions such as *In Re USC Student Health Center Litigation*, C.D. Cal, Case No. 2:18-cv-04258-SVW. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other respective Class members, and have the financial resources to do so. Neither Plaintiffs nor their counsel has any interests adverse to those of the other members of the Class.

## VI.   CLAIMS FOR RELIEF

**COUNT I**
**Violation of Title IX, 20 U.S.C. § 1681,** *et seq.*
**Creation of Sexually Hostile Culture/Heightened Risk of Sexual Harassment**
**(Against All Defendants)**

129.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

130.   Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

131.   Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of

student and employee complaints alleging any action which would be prohibited by this part."

132.   Defendants receive, and at all relevant times received, federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq.

133.   As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

134.   Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

135.   Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault—by school employees, students, and third parties.

136.   Title IX requires Defendants to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

137.   Defendant Board of Regents is responsible for setting and approving all public policy at U of M, including sex discrimination policy.

138.   Anderson was an U of M employee whose actions were carried out as athletic team doctor, and physician at U of M.

139.   Anderson's sexual harassment of Plaintiffs and Class members—which included, among other things, fondling their testicles, fondling their penises, digitally penetrating their rectums, rubbing his erect penis on their bodies, and making inappropriate sexualized comments—was sex discrimination under Title IX.

140.   Anderson's sexual harassment of Plaintiffs and Class members was rampant, occurring regularly on campus, for more than three decades.

141.   Defendants had actual knowledge of Anderson's serial sexual harassment and permitted it to continue unchecked throughout Anderson's employment.

142.   Throughout Anderson's 35-year tenure at U of M, beginning in 1968, students, student-athletes, and coaches conveyed complaints and concerns to U of M administrators and employees about Anderson's inappropriate conduct.

143.   Specifically, Defendants were notified about Anderson's sexual harassment through U of M employees with authority to take corrective action to address it.

144.   Tad Deluca publicly stated in 2020 that he reported Anderson's sexual misconduct to higher authorities at U of M in 1975, but they did nothing.

145.   U of M was required under Title IX to promptly investigate and address allegations, reports and/or complaints of unwelcome, inappropriate touching, and comments by Anderson, but U of M did not do so.

146.   U of M created and was deliberately indifferent to a sexually hostile culture within its athletic and student health programs, by, among other things:

    a.    Mishandling students' reports about Anderson's conduct and/or discouraging students from reporting Anderson's conduct;

    b.    Failing to promptly and appropriately investigate, remedy, and respond to complaints about Anderson's conduct;

    c.    Increasing Anderson's access to U of M student-athletes, despite students' complaints about Anderson's conduct;

    d.    Failing to adequately supervise Anderson, after learning that he posed a substantial risk to the safety of all male students;

    e.    Failing to take corrective action to prevent Anderson from sexually harassing other students;

    f.    Requiring student-athletes to see Anderson for annual physicals and medical treatment in order to participate in university sports and maintain their athletic scholarships—even after student-athletes complained to administrators and employees about the ways Anderson's inappropriate conduct during medical examinations; and

    g.    Joking about Anderson's conduct with students.

147.   U of M's creation of and deliberate indifference to the sexually hostile culture within its athletic and student health programs substantially increased the risk that Plaintiffs and Class members would be sexually harassed.

148.    The Board of Regents failure to set appropriate sex discrimination policy, in light of U of M's deliberate indifference to the sexually hostile culture within its athletic and student health programs substantially increased the risk that Plaintiffs and Class members would be sexually harassed.

149.    The sexual harassment that Plaintiffs and Class members suffered was so severe, pervasive, and objectively offensive that it effectively barred their access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

150.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and Class members were damaged and continue to suffer damages.

151.    In subjecting Plaintiffs and Class members to the wrongful treatment herein described, and through its violations of Title IX, Defendants, in their effort to "save face" and avoid bad publicity, acted willfully and maliciously with the intent to harm Plaintiffs and Class members, and in conscious disregard of Plaintiffs and Class members' rights, so as to constitute malice and oppression. Plaintiffs and Class members are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants, in a sum to be shown according to proof.

152.   Furthermore, Plaintiffs request the award of attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## COUNT II
### Violation of Title IX, 20 U.S.C. § 1681(a), *et seq*.
### Deliberate Indifference to Prior Sexual Harassment
### (Against All Defendants)

153.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

154.   Title IX, 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

155.   Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

156.   Defendants receive, and at all relevant times received, federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq.

157.   As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

158.   Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

159.   Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment-including sexual assault-by school employees, students, and third parties.

160.   Title IX requires U of M to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

161.   Before Anderson sexually harassed Plaintiffs and Class members, U of M had actual knowledge of Anderson's prior sexual harassment of male students at U of M, beginning in 1968.

162.   Based on Anderson's prior conduct, U of M had actual knowledge of the substantial risk that Anderson would sexually harass other male students at U of M.

163.   U of M officials, with the knowledge described above, had the authority to address the risk posed by Anderson, and had the authority to take corrective measures by, among other things, closely supervising Anderson, not

allowing him to examine to examine students without another medical professional present, or terminating his employment.

164.   U of M's failure to address the substantial risk posed by Anderson, given prior complaints and reports about his inappropriate conduct, was clearly unreasonable in light of the known circumstances.

165.   The Board of Regents failure to set appropriate sex discrimination policy, in light of U of M's failure to address the substantial risk posed by a serial predator, was clearly unreasonable in light of the known circumstances.

166.   By their acts and omissions, Defendants were deliberately indifferent to the substantial risk that Anderson would sexually harass male students at U of M.

167.   As a result of Defendants' deliberate indifference, Plaintiffs and Class members were subjected to severe sexual harassment by Anderson, including sexual assault in the guise of medical care.

168.   The sexual harassment that Plaintiffs and Class members suffered was so severe, pervasive, and objectively offensive that it deprived Plaintiffs and Class members of access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

169.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and Class members were damaged and continue to suffer damages.

170.   In subjecting Plaintiffs and Class members to the wrongful treatment herein described, and through its violations of Title IX, U of M, Defendants in their effort to "save face" and avoid bad publicity, acted willfully and maliciously with the intent to harm Plaintiffs and Class members, and in conscious disregard of Plaintiffs and Class members' rights, so as to constitute malice and oppression. Plaintiffs and Class members are therefore entitled to the recovery of punitive damages, in an amount to be determined by the court, against Defendants, in a sum to be shown according to proof.

171.   Furthermore, Plaintiffs request the award of attorneys' fees pursuant to 42 U.S.C. § 1988(b).

**COUNT III**
**Injunctive And Equitable Relief**
**(Against All Defendants)**

172.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

173.   An actual, justiciable controversy exists between Plaintiffs and Class members and Defendants. A judgment from this Court regarding these issues

would afford relief from uncertainty and insecurity with respects to rights, status, and other legal relations of the parties.

174. Defendants are required under Federal law to protect and aid its students. This includes a duty:

      a.    to protect students from sexual assaults on their campus;

      b.    to set proper policies and guidelines to protect students from sexual assault on their campus;

      c.    to report on-campus sexual assault to the proper authorities;

      d.    to respond properly to sexual assaults that do occur; and

      e.    to supervise and stop their employees from committing wrongful sexual acts with student patients.

175. Defendants have breached their duty to Plaintiffs and Class members by failing:

      a.    to set, implement and enforce appropriate policies and procedures to prevent, or properly respond to on-campus sexual assaults;

      b.    to report on-campus sexual assaults to the proper authorities, or to any authorities; and

      c.    to supervise and stop their employees from committing wrongful sexual acts with student patients, including Plaintiffs and Class members

176. Plaintiffs and Class members have an adverse legal interest to Defendants. This adverse interest and the controversy that exists between the parties can be resolved through the specific relief sought.

177.   Plaintiffs and Class members to this day suffer continuing trauma as a result of the Defendants' Institutional Betrayal and failure to implement proper protective measures. Without implementing the proper policies and procedures to protect students from serial sexual predators, Plaintiffs and Class members will continue to suffer damages as a result of Defendants' Institutional Betrayal.

178.   Wherefore, Plaintiffs, on behalf of themselves and the Class, requests that the Court issue an Order:

    a.   requiring Defendants to establish and implement a uniform policy, including training and education for its employees and staff, for how to identify sexual assault;

    b.   requiring Defendants to establish and implement a policies and procedures for the prevention and deterrence of sexual assault, including student education and messaging, clear communication of consequences;

    c.   requiring Defendants to establish and implement a uniform policy, including training and education for its employees, professors, and staff, for how to respond to student sexual assault that includes humane and trauma-informed treatment of the alleged victim(s);

    d.   requiring Defendants to track all reports of sexual assault;

    e.   requiring Defendants to establish a uniform policy, including training and education for its staff, for how to report sexual assault to the proper authorities, and making reporting of student sexual assault to authorities mandatory;

    f.   requiring Defendants to implement pre-hiring background checks of all new personnel, including physicians, who are regularly expected to have direct patient interaction;

g.      requiring Defendants to implement annual verification of credentials of all clinical personnel, including physicians;

h.      requiring Defendants provide all students accessing U of M Health Services with a consent form informing them of the U of M's commitment and steps taken to prevent any recurrence, along with a brochure outlining what to expect during a visit;

i.      create a procedure for anonymous patient feedback concerning U of M Health Services and its personnel; and

## VII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, pray that this Court:

A.      Certify the Class, name Plaintiffs as representatives of the Class, and appoint their lawyers as Class Counsel;

B.      Enter judgment against University of Michigan in favor of Plaintiffs and Class members;

C.      Enter judgment against The Regents of the University of Michigan in favor of Plaintiffs and Class members;

D.      Enter appropriate equitable relief as explained in Count III and as the Court deems just, proper, and fair;

E.      Award Plaintiffs and Class members damages for pain and suffering, and compensatory and punitive damages; and

F.      Award Plaintiffs their reasonable attorneys' fees and costs pursuant to

42 U.S.C. § 1988(b).

Dated:  September 10, 2020                    Respectfully submitted,

                                              */s/ E. Powell Miller*
                                              E. Powell Miller (P39487)
                                              Sharon S. Almonrode (P33938)
                                              THE MILLER LAW FIRM, P.C.
                                              950 W. University Dr., Suite 30
                                              Rochester, MI 48307
                                              (248) 843-0997
                                              (248) 652-2852
                                              Email: epm@millerlaw.com
                                              Email: ssa@millerlawpc.com

                                              Jonathan D. Selbin
                                              Annika K. Martin
                                              LIEFF CABRASER HEIMANN &
                                              BERNSTEIN, LLP
                                              250 Hudson Street, 8th fl.
                                              New York, NY 10013
                                              (212) 355-9500
                                              Email: akmartin@lchb.com
                                              Email: jselbin@lchb.com

                                              Joseph G. Sauder
                                              SAUDER SCHELKOPF LLC
                                              1109 Lancaster Avenue
                                              Berwyn, PA 19312
                                              (888) 711-9975
                                              Email: jgs@sstriallawyers.com

                                              *Interim Class Counsel*